OSCAR WRIGHT V. THE STATE.

No. 21207.  Delivered June 26, 1940.
Rehearing Granted October 23, 1940.

194

The opinion states the case.

*H. D. Stringer,* of Memphis, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

Appellant was convicted of the murder with malice of John Gonzales, and the jury awarded a penalty of five years in the State penitentiary.

It appears from the facts that both appellant and deceased were enrollees of a CC Camp at or near Memphis, Texas, and that they were associates in some kind of orchestral music. That they were rather intimate friends, the deceased oftentimes eating at appellant's table, and sometimes furnishing food for such table. Appellant left his home on a business trip some time in July, 1939, and was gone about a week, during which time it seems that the deceased slept with appellant's wife. This wife seems to have become enamored with the deceased, and in the following August she left appellant and went to her mother's in Vernon in Wilbarger County, and seemed to have some idea of divorcing appellant and marrying the deceased. This un-

faithfulness of the wife was communicated to the appellant, but did not seem to offend him, nor to affect the friendship existing between himself and the deceased. After his wife left him the two friends continued their association for at least three nights in succession, drinking whisky together, and visting the portion of town where the colored people lived. Appellant and deceased on the night of the killing were sitting down on a dump in a race track enclosure near the town of Memphis, with no sign of antagonism apparently existing to mar their friendship, when two negro women accosted them. Neither appellant nor deceased gave these women any encouragement and they soon left, appellant and his friend all in an apparent good humor. Appellant testified that he knew that the deceased owned a deer foot handle dagger, and that while the two were sitting down on this dump the following occurred:

"It was very dark and a very dark place in which to be, and as we turned down I just pulled out my tobacco and started a cigarette, just like passing a few words now and then between us, there wasn't anything to arouse any suspicions at all and I had rolled my cigarette and lit it and was smoking it, so he was rolling his cigarette and licked it and had it up something like that (indicating), looked like he was kind of studying, and then he turned around, he was on this side, and we was sitting kind of humped up, and I was sitting there smoking my cigarette while he still had his in his hand, and he kind of eased around, or turned around, and says, 'Wright, I was down with your wife at Vernon Sunday.' And then he says, 'You think I have been fooling with your wife and family while you was gone to Wyoming,' and I said, 'John, what I have heard and what you have said is true, I believe,' and he came around with his hands and I sprang up, and as he started to rise, all I remember, I had the hammer in my left hand, I don't know how many times I hit, and I don't know anything about the results, I was so worried about my wife and all. He didn't make any movement as long as he was turned around in this position (indicating) until I answered his question. When I answered his question, he just jumped around like that (indicating all the time at this point). I expected him to get that dagger which I had seen him with.

"When I hit him I did not intend to kill him. I hit him in self protection. I thought I was about to be attacked. I thought he had the knife with him."

It appears from the facts presented that the deceased was

struck on the head twice with some blunt instrument such as a hammer, once on top of the head and once on the side of the head, the lick on the side of the head bearing evidence of having been struck from above the head of deceased. Deceased must have died instantly as there were no signs of a struggle, and no signs of any weapons of any kind near the deceased, and nothing found in or near his hands save an unlighted cigarette.

Appellant had filed an affidavit in lunacy prior to his trial in this cause, and the issue of his sanity was submitted to a jury in the district court of Hall County on September 16, 1939. The jury found that appellant was an insane person at the time of such trial; such jury also found, however, that appellant was not insane on the 18th day of August, 1939, the date of the alleged offense. It seems from bill of exceptions No. 2, the one presenting this matter to this court, that thereafterwards appellant was committed to the custody of the authorities at the Wichita Falls hospital for the insane, and there remained for some time. That on or about February 16, 1940, the superintendent of such State hospital at Wichita Falls certified to the county judge and the district court in which this case was pending, that appellant had regained his sanity, and another jury trial was had relative to his present sanity, and by the verdict of the jury and judgment of the court appellant was found to be then sane, and thereafterwards he was placed upon trial for this homicide. We think such procedure followed the statute as set forth in Sec. 3 of Art. 932a, C. C. P., Vernon's Cr. Statutes, it being Acts 1937, 45th Leg., p. 1172, Ch. 466, which we quote: "When the defendant so committed to a hospital for the insane becomes sane, the superintendent of the hospital shall give written notice of that fact to the Judge of the Court from which the order of commitment issued. Upon receipt of such notice the Judge shall require the sheriff to bring the defendant from the hospital and place him in the proper custody until the hearing may be had before a jury in such Court to determine defendant's sanity, and if he be found sane, he shall be discharged, unless he had been previously found to be sane at the time at which he is alleged to have committed the offense charged, in which event, unless previously acquitted, he shall be tried for the offense charged."

There is but one further bill of exceptions found in the record, No. 3, and it is concerned with the cross-examination of appellant's wife. It appears that in her direct examination this witness had testified that she had talked with the deceased relative to "getting rid" of appellant, such testimony being in part

as follows: "Yes sir, I left Memphis on August 10th, which was Thursday, and went to Vernon. Before I left Gonzales told me, he said when he got rid of Oscar he would meet me in New Mexico. When I left Memphis John was down at the train to see me." And upon her cross-examination by the State the following was developed: "When I was talking to John Gonzales, I discussed about getting a divorce from Oscar before I went to live with John Gonzales. I don't know whether that is what he meant when he said something about getting rid of Oscar. I don't know whether that is what John had in mind, me getting a divorce from Oscar and then going to live with John. Yes, John told me that I would get a divorce from Oscar. We talked about that. I knew if he was going to be killed I couldn't get a divorce from a dead man. No, sir, that is not the only manner of getting rid of Oscar; that was mentioned to me by John, getting rid of him by divorce. I don't know what other means of getting rid of him was mentioned. If they were mentioned, I don't know what they were nor when they were mentioned, or who mentioned them. The only way mentioned to me about getting rid of Oscar was by divorce."

We are convinced that such a cross-examination was properly heard on matters brought out by the appellant on his direct examination of the wife.

There are some objections to the trial court's charge in that it is contended that same did not submit to the jury that it was necessary that appellant have a specific intent to kill before a conviction could be had herein for murder. We think this objection was fully met by the court in its charge, paragraphs ten and eleven thereof, wherein it was said that unless the jury believed beyond a reasonable doubt that appellant at the time he struck the deceased had the specific intent to kill deceased, he should be acquitted of murder.

Again appellant complains because the court failed to charge on the law of uncommunicated threats. We are unable to find any facts in the record that would call for such a charge, nor does the law require such. There is also a complaint that the court failed to charge on apparent danger. This complaint is unfounded. Paragraph twelve of the charge gives a comprehensive charge on such theory.

We find no error in the record, and the judgment is affirmed.

ON MOTION FOR REHEARING.

BEAUCHAMP, Judge.

On motion for rehearing further consideration has been given to the bill of exception taken to section twelve of the court's charge on the right of self defense under apparent danger. The part of said section of the charge complained of is that applying the law to the facts of this particular case in the following language: "Now, if you believe that the defendant struck and beat John Gonzales with a hammer, if he did, as you may find from the evidence before you, *as a means of self defense,* believing at the time that he did so, if he did, that he was in danger of losing his life or of suffering serious bodily injury at the hands of John Gonzales or if you have a reasonable doubt thereof, then you will find the defendant not guilty."

We believe the foregoing is too limited. Mr. Branch says, Section 1921: "If there is evidence that defendant was defending against apparent danger, it is error to restrict the right not to retreat to actual danger."

In Cooper v. State, 89 S. W. 1068, Judge Davidson says at page 1071: "The charge in regard to self-defense is criticised because it confines the jury to the consideration of an actual assault and one of real danger, instead of a threatened assault and apparent danger. Upon another trial, the court should bear this in mind, and charge the jury in accordance with the testimony relied upon to prove that theory of the case."

In the case at bar the charge may not be so severely criticised in so far as it defines the law of self defense, but when it applies the law to the facts of this case in the language above quoted instead of saying to the jury that if they believed the defendant struck and beat Gonzales with a hammer, "as a means of self defense," the court should have embraced within such charge the elements of self defense under apparent danger. It is too uncertain that the jury would resort to the whole section of the charge to determine the full latitude given to the defendant by law under the facts of his case. Self defense, as that is used, is too restrictive.

Having a doubt that the jury properly understood this charge, it is our duty to require that it be presented in unmistakable language so as to make clear the meaning of the charge. Such part of Section 10 of appellant's exception to the court's charge as deals with this point is well taken.

The motion for rehearing is granted, the judgment of affirmance set aside and the case reversed and remanded.